Lee, J.
The testator, who was a member of the Society of Friends, departed this life in the year 1834. By a codicil to his will, dated on the 7th of June 1834, after certain specific bequests, he directs the proceeds of his estate, which was to be converted into money, to be divided into three equal parts, and to be disposed of as follows: One-third for the benefit of his father during his natural life; one other third to be applied to the payment of a bond due his brother Thomas Maddox, or whatever sum might be due upon such bond; and the interest of the remaining third to go to Ms brother William G. Maddox during his natural life. At the death of his father, the third set apart for him to be returned to his estate, and disposed of according to his will. At the death of his brother William, the third “loaned” to him to be given to his daughter Ann Maria Maddox, “ during her single life, and forever, if her conduct should be orderly, and she remain a member of Friends Society.” The codicil concluded with the following clause: “ Furthermore, at the closing of all the above things, I wish to give and bequeath all the remaining part of my estate to my nearest relations that may be then living, and that shall be at that time members of the Society of Friends.”
After the death of the testator, and during the life time of her father, Ann Maria Maddox married the appellee Thomas Tiller, who was not a member of the Society of Friends, and thereby, according to the rules and discipline of the society, forfeited her right to membership. The appellee William Garland Maddox also left the society, but the time at which he did so is nowhere disclosed by the record.
*806 As Mrs. Tiller is claiming the benefit of the bequest iQ remainder to her after the death of her father, and as both she and Garland Maddox are claiming as two ^ie next of kin of the testator to participate in the residuum, we are called upon in this state of the cáse, to j>ass on the validity and effect of the two bequests in this codicil. i
As by the rules of the Society of Friends, a member who married out of the society thereby forfeited his membership, the effect of the bequest of the third in remainder to Ann Maria Maddox, was to restrict her to marriage with a member of the society. Upon her marriage, the estate given to her “ during her single life,” would, according to the terms of the codicil, be determined; and if she married a person who was not a member of the society, she herself ceased to be a member, and was thus excluded from further enjoyment of the estate. The question then, as it respects the bequest of the third in remainder to Ann Maria Maddox, is as to the validity of such a restraint upon marriage under the circumstances disclosed in this case.
It will not be questioned that marriages of a suitable and proper character, founded on the mutual affection of the parties, and made upon free choice, are of the greatest importance to the best interests of society, and should be by all proper means promoted and encouraged. The purity of the marriage relation and the haj>piness of the parties will, to a great extent, depend upon their suitableness the one for the other, and the entire freedom of choice which has led to their union; and upon these, in their turn, in a great degree must depend the successful rearing of their children, and the proper formation and development of their character and principles. Hence not only should all positive prohibitions of marriage be rendered nugatory, but all unjust and improper restric *807 tions upon it should be removed, and all undue influences in determining the choice of the parties should be carefully suppressed. Accordingly, in the civil law all conditions annexed to gifts and legacies which went to restrain marriages generally, were deemed inconsistent with public policy, and held void. Poth. Pand. lib. 35, title 1, n. 35; Dig. xxxv, tit. 1, 1. 22, 64, 72. This doctrine has been introduced into the English law with certain modifications, suggested by a. disposition to preserve to parents a just control and influence with their children, and the means of protecting youthful persons against the sad consequences of hasty, unsuitable or ill assorted marriages. Conditions, therefore, in restraint of marriage, annexed to gifts and legacies, are allowed when they are reasonable in themselves, and do not unduly restrict a just and proper freedom of choice. But where a condition is in restraint of marriage generally, it is deemed to be contrary to public policy, at war with sound morality, and directly violative of the true economy of social and domestic life. Hence, such a condition will be held utterly void. 1 Fonbl. Eq. lib. 1, ch. 4, § 10, n. q. 255; Godolph. on Leg. part 1, ch. 15, § 1, p. 45; Harvey v. Aston, 1 Atk. R. 361; Scott v. Tyler, 2 Bro. C. C. 431, 487; S. C. 2 Dick. 712, 721; 2 Lomax Ex. 80; Kelly v. Monck, 3 Ridgw. Parl. R. 205; Hoopes v. Dundas, 10 Penn. R. 75; 1 Eq. Cas. Ab. 110; Rishton v. Cobb, 9 Sim. R. 615, 16 Eng. Ch. R. 616; 2 White and Tudor’s Lead. Cas. in Eq. part 1, p. 280, n.
In Elizabeth Castle's Case, Law Jurist, December 1846, the vice chancellor declared, in general terms, that “ limitations in restriction of marriage, were objectionable and in Long v. Dennis, 4 Burr. R. 2052, Lord Mansfield said, “ Conditions in restraint of marriage are odious, and are therefore held to the utmost rigor and strictness. They are contrary to sound policy.” And accordingly, even in those cases in which *808 restraints of a partial character may be imposed on marriage, as in respect of time, place or person, they be such only as are just, fair and reasonable. Where they are of so rigid a character, or made so dePen^en^ 011 peculiar circumstances, as to operate a virtual though not a positive restraint on marriage, or unreasonably restrict the party in the choice of marriage, they will be ineffectual and utterly disregarded. Thus, a condition in restraint of marriage excluding men of a particular profession, has been held void. 1 Equ. Ca. Ab. 100. So a contract not to marry within six years is void because it tends to discourage marriage. Hartley v. Rice, 10 East’s R. 22. So a covenant with a woman not to marry any other person, has been held not to be binding. Lowe v. Peers, 4 Burr. R. 2225. So a condition annexed to a legacy to a daughter, forbidding her to marry any man who had not a clear unincumbered estate in fee or freehold perpetual, of the yearly value of five hundred pounds, was declared by the lord chancellor to be worthy of condemnation in every court of justice s and it was held void as leading to a probable prohibition of marriage. And Judge Story lays it down, that restraints in respect of time, place or person, may be so framed as to operate a virtual prohibition upon marriage, or at least upon its most important and valuable objects; and he illustrates by a condition that a child should not marry till fifty years of age; or should not marry any person inhabiting in the same town, county or state; or should not marry any person that was a clergyman, a physician, or a lawyer, or any person except of a particular trade or employment; all of which, he tells us, would be deemed mere evasions of the law. 1 Story’s Eq. Jur. § 283. In these he seems to be borne out by the opinion of Lord Chancellor Clare, in Keily v. Monck, ubi supra.
Following these principles and the cases I have *809 cited for my guide, and looking to the facts in proof in the cause, I cannot avoid coming to the conclusion, that the condition imposed by the bequest of the third in remainder to Ann Maria Maddox, which in effect forbade her to marry any other than a member of the Society of Friends, was an undue and unreasonable restraint upon the choice of marriage, and ought to be disregarded. It is in proof, that when she became marriageable, the number of Quakers in the county of Hanover, in which she resided, and the vicinity, was small, and that it had been since diminishing. There were not within the circle of her association, more than five or six marriageable male members of the society, according to one of the witnesses, or three or four, according to another ; and the probability is, as stated by one of the witnesses, the restriction imposed by the condition would have operated a virtual prohibition of her marrying. To .say there were members of the society residing in other counties, is no answer to the objection. She certainly could not be expected, if she had the means, which it seems she had not, to go abroad in search of a helpmate; and to subject her to the doubtful chance of being sought in marriage by a stranger, would operate a restraint upon it far more stringent than those which are repudiated in the cases and illustrations which I have already cited.
The case of Haughton v. Haughton, 1 Molloy 612, 12 Cond. Eng. Ch. R. 295, has been cited in support of the restriction in this case. But that case and the case of Perrin v. Lyon, 9 East’s R. 170, where the condition was not to marry a Scotchman, which is relied on by the lord chancellor as decisive, were cases of devises of realty; and there is a well settled distinction between them and bequests of personalty, such as is the present case. The former are governed by the rules of the common law, and the rules of the ecclesiastical .courts which control bequests of personalty, *810 are regarded as inapplicable. 2 Pow. on Dev. 282; 1 Jarm. on Wills 836; Harvey v. Aston, 1 Atk. R. 361; Reynish v. Martin, 3 Atk. R. 330; Stackpole v. Beaumont, 3 Ves. R. 89; 1 Fonbl. Eq. ch. iv, § 10, n. q, p. 258. Moreover, it may well be questioned how far a . . , J ,. . , , , decision upon such a question m a country already overstocked with inhabitants, is applicable to a country like ours, with an unbounded extent of territory, a large portion of which is yet unsettled, and in which increase of population is one of the main elements of national prosperity. No where can the policy of repudiating all unnecessary restraints upon freedom of choice in marriage apply with more force than among a free people, with institutions like ours, and in the circumstances by which we are surrounded. For this reason, and for another that will be presently adverted to, I should not feel disposed to follow the decision referred to, if it were even more strictly applicable to this case.
But treating the condition annexed to the bequest in remainder to Ann Maria Maddox, as a partial restraint upon marriage, by requiring her to marry (if she married at all) a member of the society, on pain of forfeiting her membership and the benefit of the bequest, if she married one who was not, there is another and distinct ground upon which it will be disregarded. There is no bequest over of the third thus given to her in case of her breach of the condition; and the condition therefore will be treated as in terrorem merely, and the legacy becomes pure and absolute. 1 Roper Leg. ch. 13, § 1, p. 654; Garret v. Pritty, 2 Vern. R. 293; Wheeler v. Bingham, 3 Atk. R. 364; Lloyd v. Branton, 3 Meriv. R. 108, 117. Nor will the residuary clause be regarded as equivalent to a bequest over. To render the condition effectual, there must be an express bequest over on breach of the condition, or a special direction that the forfeited legacy shall fall *811 into the residuum. 1 Jarm. on Wills 841; Scott v. Tyler, 2 Dick. R. 723; Wheeler v. Bingham, 3 Atk. R. 364; Keily v. Monck, 3 Ridgw. P. C., 205, 252; Lloyd v. Branton, 3 Meriv. R. 108; McIlvaine v. Gethen, 3 Whart. R. 584.
There is yet another view, which is also equally applicable to the bequest of the residuum, in which the restriction imposed on the bequest of the third in remainder to Ann Maria Maddox, should be held to be void and ineffectual. And the case must be considered in this aspect, because upon the results to which we are brought upon such consideration, must depend the claim both of Mrs. Tiller and Garland Maddox to participate in the residuum. It is insisted by the counsel, it is true, that there is no proof of disorderly conduct on the part of Mrs. Tiller, nor that she has ever been actually disowned as a member; or if she have been, that she might still be reinstated; and as she has applied for and done all in her power to gain such readmission, but has been refused by the society whose action she could not control, she should be regarded as having complied with the condition prescribed, cy pres, and should now be exempt from the disability which it creates. And as to Garland Maddox, it is urged that there is no proof he is not a member, and as he once was a member, it should be presumed that he still remains such until proof be given to the contrary. But the pretensions of these parties cannot be sustained on these grounds. Mrs. Tiller’s conduct was disorderly in the sense intended by the testator, in marrying one who was not a member of the society, contrary to its rules and discipline. In their answer, she and her husband say distinctly that she had left the society; and the fact of her applying for reinstatement sufficiently implies that she had been disowned and excluded. Her application for readmission, however, was not successful, but was rejected *812 because the “Monthly Meeting” distrusted the motives by which it was prompted. She is not, therefore, and has not been a member of the society since she was disowned upon her marriage, which took place some time, probably several years, before the death of her father. And as to Garland Maddox, the bill charges that he was not a member of the society, and on that account was- not entitled to participate in the residuum under the' clause of the codicil by which it is disposed' of. Garland Maddox in his answer does not pretend that he is a member, nor does he make any claim to participate as such. He rests his claim upon the ground that he-is one of the-next of kin, and that the restriction of the benefits of the bequest to such of them only as should be members of the “ Society of Friends,” a body unknown to the law, is- illegal and void. And he swears to- his answer in the- usual- mode, instead of making a solemn affirmation, which) i't is-understood is the universal usage with the members of the Society of Friends.
It will not be denied that one of the most marked and distinctive features of our civil institutions, is- the perfect, absolute and unqualified freedom of opinion in matters of religion which they secure to all who dwell under them. Unjust encroachment upon the rights of conscience, in no inconsiderable degree, gave impulse to the early immigration from the European continent to this, in the hope that upon this new and virgin soil might be enjoyed that full and unquestioned freedom of opinion in matters of religion which was deemed a part of the natural rights of man, but which was denied toi him in the old world. It was the spirit of resistance to such encroachment which filled the sails of the May Flower, and wafted her, with the Pilgrim Fathers upon her decks, to their landing on Plymouth rock. It was the same spirit which brought Huguenots to Virginia and to South Carolina, Catho *813 lies to Maryland, Quakers to Pennsylvania, and Presbyterians to several of the colonies. Hence, nothing was inore natui'al or more certain than that when the separation took place from the British crown, and the state of colonial dependence was replaced by a separate and independent government, the 2-ights of conscience and freedom of opinion in matters of religion, should have a prominent and well assured place in the new institutions. Thus we see the sixth article of the constitution of the United States provides that no religious test shall ever be- required as a qualification to any office or public trust under the United States. And the first article of the amendments to the constitution declares, that congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. So the sixteenth section of the bill of rights of Virginia, passed unanimously in convention on the 12th of June 1776, adopted by the convention of 1829-30, and again by that of 1850-51, declares- “that religion or the duty we owe to our Creator, and the manner of dischaiging it, can be directed only by reason and conviction, not b-y force- or violence; and therefore all men are equally entitled to the free exercise- of religion according to the dictates of conscience; and that it is the mutual duty of all to practice Christian forbearance, love and charity towards each other.” And again: By the act for establishing religious freedom, passed in 1785, the natural rights of mankind upon this subject are set forth and asserted to their fullest extent, and in their widest comprehension, and pi-ovision made to hold them sacred, and to give to them their fullest effect. Again : By the amended constitution of 1830, article 3, § 11, and also by that of 185Í, article 4, § 15, it is declared that “ no man shall be compelled to frequent or support any religious worship, place or ministry whatsoever, nor shall any man be enforced, restrained, molested *814 or burthened, in his body or goods, or otherwise suffer on account of his religious opinions or belief: but all shall be free to profess and by argument to main^beir opinions in matters of religion, and the same shall in nowise affect, diminish or enlarge their civil capacities. And the general assembly shall not prescribe any religious test whatsoever, or confer any peculiar privileges or advantages on any sect or denomination, or pass any law requiring or authorizing any religious society or the people of any district within this commonwealth to levy on themselves or others any tax for the erection or repair of any house for public worship, or for the support of any church or ministry; but it shall be left free to every person to select his religious instructor and to make for his support such private contract as he shall please.” And.to guard the legislation of the state against any clerical or sectarian influence, by both of these constitutions, all ministers of the gospel and priests of any religious denomination are declared to be incapable of being elected members of either house of assembly. Constitution 1830, article 3, § 7 ; constitution 1851, article 4, § 7. Other provisions of our law might be cited, all showing the studied purpose on the part of our law givers to guard carefully the rights of conscience, and to hold them sacred and inviolate.
I take it, then, that upon no subject is the policy of our law more firmly settled, or more plain, clear and unmistakable than upon this, and that all contracts and all conditions to the same or to gifts or legacies the effect of which is to thwart and violate this policy, should be held to be utterly void and ineffectual. And I regard a restriction imposed by the terms of a bequest, requiring as the condition of its enjoyment, that the legatee should be a member of any religious sect or denomination, as directly violative of this policy, and pregnant with evil consequences. It holds out a *815 premium to fraud, meanness and hypocrisy; it tends to corrupt the pure principles of religion, by holding out a bribe for external profession and conformity to a particular sect; and however pure and honest the motives of the beneficiary may be, he is yet rendered an object of distrust and suspicion; and we see in this case that although no other “ disorderly” conduct than marrying out of the society was imputed to Mrs. Tiller, yet her application to be reinstated was rejected, because, in consequence of the condition annexed to the bequest in her favor, the meeting took up the impression that it was prompted by unworthy and mercenary motives; it hampers the conscience, holds out inducements to stifle its voice and to resist the force of reason and honest conviction; it tends to destroy true religion, and to replace it with what is false and counterfeit; and, in short, it tends to promote all or most of the evils so forcibly denounced in the preamble to the act already cited. See the opinion of Lord Eldon upon a similar subject, in Kircudbright v. Kircudbright, 8 Ves. R. 51.
In England, as we know, the established church constitutes an element, and a material element, in the government; and different ideas and a different sentiment prevail. With these the judges in that country must necessarily be deeply imbued. Of this we have an illustration in the case of Haughton v. Haughton. The lord chancellor thought the restriction good, but had some hesitation about it, which induced him to offer to send the case to a court of law on the point. The doubt was not whether the condition did not impose an unreasonable restraint or an improper restriction upon freedom of choice in marriage, but whether it was not void because it in effect forbade marriage with a member of the established church. And if there be other cases which, like that just referred to, appear to favor the validity of such a restriction, I do *816 not feel disposed to follow them as authority; and however it may be in England, I think such restriction here is contrary to the genius of our institutions, to the spirit of .our government and to the policy of our laws, and -as such is utterly nugatory, and should be held for nought.
It may be said, however, that as the restriction in the residuary clause is in. the nature of a condition precedent, no estate .can vest, if it be not .complied with, whether it be valid or void. This is undoubtedly true in reference to devises of real estate with a precedent condition in restraint of marriage; for though void, yet if it be not complied with, no estate ¡arises in the devisee. If it be a legacy of personal .estate, however, under like circumstances, the legacy will be held good and absolute as if no condition whatsoever had been annexed to it. 1 Story’s Eq. Jur. § 289. And there would be every reason for applying the same doctrine to a restriction like that in this case. But the question is wholly immaterial here ; because, if the restriction be held void, it is of no consequence whether the bequest fail or take effect, for either way the residuum goes to precisely the same parties and in the same proportions, the only difference being that in the one case they take as distributees, in the other as legatees.
There are other difficulties attending the restriction annexed to this residuary clause, which render it questionable, if it do not involve so much of ambiguity and uncertainty as to the subject and the time of distribution, and the objects of the gift, as may render it void for that cause. If indeed we may discard the idea of time in construing the expressions, “ at the closing of all the above things,” “that maybe then living, and that shall be at that time members of the Society of Friends,” and yielding to the disposition in favor of vesting estates, can refer the time at which *817 the gift is to take effect to the death of the testator, then no difficulty could occur: for at that time Mrs. Tiller was.still a member of the Friends Society; and in the absence of proof we might also infer, that Garland Maddox was also still a member: and so no question could arise. But I think this cannot be done, because the testator seems plainly to have contemplated some period after his death at which the bequest was to take effect. What, then, was the period intended by him'? The balance of the third not needed to pay the debt to Thomas Maddox, might be ready for distribution many years before the third given to the father for life would fall in upon his death. Would the former be distributed when it was ready, or would it be held up till the death of the father, and one distribution be made of the whole at that time ? If the former, and the third given to the father for life, were to be the subject of a separate division upon his death, then a different -class might come in at the first division from those who would be entitled at the second, because some of those embraced by the bounty, who were members of the society when the first division should take place, might cease to be so before the period arrived for the second. If one distribution of the whole is to be made, then the part remaining of the third, after paying the debt to Thomas Maddox, must be held up till the death of the father, that it may be ascertained which of the next of kin were members of the society at that time. And how is the court to, determine the question of membership ? Beligious societies, we know, are subject to schisms leading to a complete separation, and the formation of new and distinct societies. They have occurred in the Society of Friends. A schism in the society in England in 1801, which led to the formation of a new society called New Lights by the old society. So stated in Haughton v. Haughton, ubi sup. *818 In this country a separation took place some years since, between those who were called Hicksites, after the mover of the secession, Elias Hicks, and those who called themselves the Orthodox Quakers. Both societies claimed to be the true orthodox sect, and each repudiated the claims of the other. If the court were called on in case of such a division to say which was the true orthodox society, how would it determine between the conflicting claimants ?
I shall not enter upon these enquiries, because, for the reasons I have already given, I think the Circuit court did right in treating the restrictions in the codicil as inoperative and void: and I am therefore of opinion to afSrin the decree.
The other judges concurred in the opinion of Le e , J.
Decree affirmed.